UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(CENTRAL DIVISION)

LADDAWN, INC. & LADD LAVALLEE,
Plaintiffs,

v.

MARC D. BOLDUC,
Defendant.

CIVIL ACTION NO.

# COMPLAINT

## PARTIES

1. Plaintiff, Laddawn, Inc. ("Laddawn"), is a Massachusetts corporation with a principal place of business in Devens, Massachusetts.

2. Plaintiff, Ladd Lavallee, is a co-owner of Laddawn, Inc. and President of Laddawn. Mr. Lavallee resides in Lancaster, Massachusetts.

3. Defendant, Marc D. Bolduc, is a former employee of Laddawn and a resident of Worcester, Massachusetts.

## JURISDICTION AND VENUE

4. All facts relevant to this action took place in the Commonwealth of Massachusetts.

5. The Court may properly exercise personal jurisdiction over the defendant consistent with the due process requirements of the United States Constitution and subject matter jurisdiction pursuant to the terms of 28 U.S.C. § 1331 and 15 U.S.C. § 1125, as set forth in Count One. In addition, the Court may exercise pendant jurisdiction over the claim of libel set forth at Count Two, pursuant to the terms of 28 U.S.C. § 1367.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND FACTS

### A. Mr. Bolduc's Job Performance History

7. Mr. Bolduc was hired by the predecessor to Laddawn, Northeast Poly Bag, Co., on July 12, 1999, as a Network Administrator within the company's Information Systems Department.

8. Mr. Bolduc was a valued employee in his role as Network Administrator, but displayed a propensity to refuse to share his knowledge with colleagues so as to attempt to inflate his importance to the company.

9. As early as July 2001, Mr. Bolduc was counseled in his Annual Review by his manager, Jim Maloy, as follows: "I would like to have you educate [a co-worker] and myself on the inner workings of the network so that we can first, absorb some of your workload in order to free you up for other projects and second, better maintain our systems in your absences. As we have discussed before, I feel that this will be a great benefit to the department and to Laddawn, Inc."

10. Despite the clarity of the message from his manager in the 2001 Annual Review, Mr. Bolduc continued in his efforts to prevent co-workers from gaining access to the depth of his knowledge relative to the company's information systems network. Accordingly, in his 2002 Annual Review, his manager, Mr. Maloy, stated: "Again this year I would like to focus some energy on 'technology transfer' across the department. I think it is important in many way [sic] to cross train each other so that we are best positioned to support our environment under all circumstances."

11. The theme of trying to convince Mr. Bolduc to share his knowledge and, thereby, diffuse his ability to hold Laddawn and its network captive to his whims continued through the years. In his 2004 Annual Review, his manager noted: "A goal I'd like both us of [sic] to focus on this

year is one we've discussed often. I think we should take steps to make sure that we continue to balance your workload using both system automation and people to help us in the effort." The reference to "people to help" had been repeatedly discussed with Mr. Bolduc as a requirement that he transfer some of his in-depth knowledge of the company's network to his co-workers.

12. As of 2005, Mr. Bolduc continued to keep his knowledge hidden from his co-workers and continued in his efforts to hold the company captive to his refusal to share critical information relative to the information systems of Laddawn. As noted by his manager in Mr. Bolduc's 2005 Annual Review: "The goal that I'd like to focus on together this year is one that we've recently discussed. I think that I have relied on you heavily for our system and network needs and by doing so have left us with an extremely weak backup position. I think there is a great deal of information that is only known by you and we need to get it identified and documented so that we are in a position to be prepared for any unplanned emergencies or absences."

13. During his first decade of employment with Laddawn, Mr. Bolduc was afforded a great deal of independence and was permitted to work remotely as he desired. By 2008, however, Mr. Bolduc was being counseled to be more visible on site and work a more traditional schedule in which his co-workers would have greater face-to-face access to him. As specifically stated as a goal in Mr. Bolduc's 2008 Performance Review: "...Marc has been asked to work a more traditional work style than the one he has been accustomed to."

14. By 2008, Mr. Bolduc was also being counseled to improve his professional relationships with co-workers. As set forth in the 2008 Performance Review: "On a professional basis people are very often frustrated with Marc. These people struggle with the difficulty it seems to take in getting things accomplished. I have mentioned [this] to Marc in the past and he has made strides to focus on improvement in this area. That said, I believe he needs to continue this focus in the

foreseeable future. . . . From a professional development point of view I believe Marc needs to focus his energies on building his professional relationships through flexibility, open mindedness, and attentiveness to user desires."

15. Mr. Bolduc's job performance, thereafter, was strong for several years, as he became more collaborative in his approach to co-workers.

16. In 2014, Mr. Bolduc's job performance deteriorated. As noted in his 2014 Performance Review: "This year I've noticed a few more slippages in covering all bases or remembering all the facts about a situation . . . . I wonder if the work that you do is always done in the most efficient ways and the best sequence. . . . In 2015 it will be important that you use your independence thoughtfully and balance it well with the collaborative work that is so essential to Laddawn. . . . This year I have seen a decline in your ability to be reliable. We have had our differences in philosophy and I believe this has affected your desire to be dependable. . . . To be very direct I have been disappointed and frustrated with some of the judgments you have made about how you do your work and how you deal with people and situations. . . . This has been a difficult year. We have battled through some differences in philosophy and I have been disillusioned with some of the decisions you have made about when and where you work and how you work with others. Your ability to affect the ways others work has been compromised. . . . The opportunities to work with you have been a bit more limited and relegated to remote rather than in person interactions. Also, you have been less open to the thoughts and ideas of others and more isolated in in [sic] the work that you've done. In 2015 it is important to get you back into the collaborative mode with more openness and willingness to work together in a way that feeds into the new organizational identity and fuels your best work. . . . In 2015 I'd like you to adjust your priorities and work style to thrive in the atmosphere that we have created. Make it

a priority to be in the building and in important rooms. Be clear and consistent with your schedule, communicative of it, and true to it. Be physically and verbally visible. Be open to the ideas of others as to how to solve a problem. Be very communicative of the work that you do while speaking in terms of planned versus actual activities. In this way you have will [sic] significantly more opportunity to bring great ideas to the table and to drive them to important results. You will also reclaim the confidence of many of your co-workers that has suffered in recent times."

**B. Mr. Bolduc's Discipline History**

17. On April 22, 2014, Mr. Bolduc received a documented counseling for unprofessional behavior in the workplace. As stated in the documented counseling: "You had a conversation with [a co-worker] on Monday, April 14th, after receiving a call from her for your support on an issue in our Texas facility. After that call, you proceeded to send [your co-worker] three e-mails between the dates of April 14-15 that [your co-worker] found increasingly upsetting. . . . The language used in your emails, as well as the tone of the messages, showed insufficient sensitivity. It was inappropriate and passive aggressive to attach the website link to an obituary in this context. This conduct is not representative of the way we work together at Laddawn. In the future, I encourage you to make more measured and sensitive responses in moments of frustration."

18. In April 2014, Mr. Bolduc's behavior and emails to his co-workers became a cause for concern that ultimately led to his being directed to take time off from work to seek counseling assistance to deal with emotional issues he had disclosed. As a condition of his return to work, Mr. Bolduc was required to sign a release form that would permit his counselor to advise Laddawn of progress. In addition, Mr. Bolduc was informed that his counselor would be

required to provide a note clearing Mr. Bolduc for return to work prior to his being permitted to return. Mr. Bolduc was greatly appreciative of Laddawn's efforts to assist him. In an email, dated May 1, 2014, he stated: "Just to follow up and let you know that [the counselor] and I did meet this morning, and the conversation we had was immensely helpful to me. I also did sign the release form, and will work with [the counselor] to work through complete resolution in this chapter of my life. I also appreciate the guidance you all have offered, and to let you [know] how good it feels to me that you all care so much about me. Thanks again, - Marc."

19. Upon his return to work, Mr. Bolduc's behavior continued to be unprofessional. He was, therefore, provided a detailed written counseling from his manager on June 17, 2014. As stated in relevant part:

> "You have been on my mind a lot lately and I have been worried about you. . . . Above all else I hope you'll see in these words that I care about you as a person and a co-worker and hope this approach will help us move forward in a positive way.
>
> Recently, your actions and behaviors have been erratic and inconsistent. This has been disconcerting to me but has also been evident and troubling to the peers and managers around you. Frankly, many see these behaviors as a continuum rather than a departure.
>
> I find that people have a hard time putting a finger on the issues that pain them in relation to your work. But I hear very consistent themes, and I admit to witnessing them first hand. They describe a tendency toward uneven behavior and accountability, a preference to be inexact about your commitments, and a broad wake of turbulence behind too many of your efforts and communications. In short, they describe fatigue in dealing with what feels like an unreasonable level of effort in partnering with you on essential work.
>
> Much of your work is performed in an 'off the radar' way. You work quietly and independently and often at home or away from your constituency. In addition, you are not eager to accept help from others who are sometimes better positioned to finish tasks and solve problems. This leads to an unsatisfying, at times frustrating experience for your co-workers.
>
> In addition, your co-workers describe the feeling that you are not open-minded to the ideas of others. Again, I have experienced this as well. Your self-reliance tends to get in the way of your ability to collaborate with others in a satisfying and sometimes more successful way.

> This is a difficult message to write and I'm sure it's harder to read. But I urge you to look past the instinct toward defensiveness. . . ."

20. On November 11, 2014, Mr. Bolduc received another documented counseling from his manager as follows:

> "Marc,
>
> I've shared some important concerns with you recently. I'm putting them in writing, as well, to give them clarity and emphasis.
>
> This summer, I explained my view that you are not sufficiently accountable, and that you show a preference for being inexact about your whereabouts and commitments. I described the resulting frustration I feel, along with too many of your coworkers, about partnering with you on essential work.
>
> When we met in person about those concerns, we agreed that one important remedy would be to have you on site in the Devens corporate office more often. We agreed on a schedule for your time in the office, and discussed the value of being available for the increasingly collaborative work the IT group does.
>
> Immediately following those conversations, you were on site during your scheduled office hours more often than ever before. But your consistency has declined steadily. Over time, the reasons you cite for being away from the office vary, but the general state of affairs does not. This is undermining your effectiveness, the department's, and mine."

**C. Mr. Bolduc's Inappropriate and Threatening Behavior and His Unhealthy Obsession with Laddawn's President, Ladd Lavallee**

21. In 2015, Mr. Bolduc's behavior became increasingly erratic and threatening.

22. Shortly prior to his termination from employment with Laddawn, Mr. Bolduc emerged from a meeting with his manager. A co-worker saw him in the parking lot outside the building. Mr. Bolduc was visibly upset. Mr. Bolduc indicated he had just left a meeting with his manager, Mr. Maloy. After this statement, he raised his shirt to reveal a handgun in his waistband. He then continued to his vehicle.

23. On April 2, 2015, Mr. Bolduc sent an e-mail to a long-term co-worker in which he stated: "BTW, you're a fucking dick and you owe me $230.00!!"

24. In response, the co-worker emailed Mr. Bolduc as follows: "I'm the dick? Do your job and stop thinking of reasons not to. This reminds me of the auto 'out of office' days, when you were afraid. It's ok, everything is going to be ok."

25. Later that same evening, Mr. Bolduc threateningly responded by email as follows:

> "I don't remember ever being afraid of anything ass hole, and I don't need you to tell me everything is going to be OK, because you have no fucking idea. You take the ambulance to the ER for a sore throat, you fucking pussy. Try being a real man and walk that walk, because I know all about your silly talk. I'll slap your scrawny ass around like a rag doll if you ever cross this line again. I thought real men had this unwritten understanding of what's sacred to our club, but don't ever, ever call me afraid of anything ever again, or I will break your nose on the spot. I know today that I should have taken a joy ride to the ER a couple of times last year, but I manned up and kicked the grim reapers ass in the end. You're a waste of my time.......
>
> Thanks for fucking up my day....."

26. Late in the evening on April 10, 2015, Mr. Bolduc sent a long, rambling e-mail that was inappropriate, unprofessional and accusatory in tone to Laddawn's Human Resources Manager, Cindy Hanam. In so doing, Mr. Bolduc copied the President of Laddawn, Ladd Lavallee; co-owner, Dawn Seiple; Mr. Bolduc's manager, Jim Maloy; and Laddawn's CFO, Donald Hafer.

27. The next morning, Laddawn's President, responded as follows:

> "It's plain you're angry with Cindy, Marc. You've levelled some very stiff accusations. It's certainly provocative to say that she selfishly placed her agenda ahead of the organization, and to infer that your coworkers have a dim view of HR, but you haven't convinced me it's fair. At some point, I'll want you to share some detail with Cindy present to offer her perspective.
>
> Email isn't a good forum for this conversation. I'm not looking to further the conversation online. I hope your recovery gets back on track and we can meet in person soon. If we can't get in the same room, we should set up a conference call.
>
> I'll talk with Cindy and Donald about next steps on Monday."

28. Rather than follow the President's direction and respond professionally and appropriately, Mr. Bolduc insubordinately responded: "Sorry, not interested in a call."

29. Mr. Lavallee showed great restraint by not either disciplining Mr. Bolduc or terminating his employment and, instead, responded: "That would create a difficult situation. Have a good weekend and reconsider."

30. Mr. Lavallee's concern for both Mr. Bolduc and the safety of Laddawn's information systems and network was voiced in an email to key staff members on April 11th, following Mr. Bolduc's unprofessional email to Ms. Hanam, as follows: "Marc's message shows bad judgment. I'm worried about his state of mind alongside his access to our critical systems. Let's talk early next week about what's best for Marc and Laddawn. I'm worried about both."

31. Unable to remain professional in his dealings with the President, Mr. Bolduc further responded to Mr. Lavallee on April 11th, while no longer copying the original email recipients, as follows: "To be clear, if I'm angry with anyone, it's you. But I'm not angry, I'm really hurt that I lost you as a friend, that's what bothers me more than anything, I[f] you want to talk to me in the same room, you can come to my house."

32. Mr. Lavallee replied with restraint once again that same day: "I'm sorry you see it that way. I do not. But you are making it difficult to help you. Professionally, it's not ok for me to drop everyone else from this thread. Let's leave it here."

33. Mr. Bolduc continued by escalating his unprofessional rhetoric as follows: "OK, so unprofessionally, I think your idea sucks and am bringing everyone else back in on the thread when I sent the original message to Cindy." He then cut and paste his prior email message into the body of this email, but in bold form, as follows: **"To be clear, if I'm angry with anyone, it's you. But I'm not angry, I'm really hurt that I lost you as a friend, that's what bothers me more than anything, I[f] you want to talk to me in the same room, you can come to my**

**house."** Mr. Bolduc concluded his email to the President of Laddawn as follows: **"This is between you and I, grow a pair . . . . ."** (bold in original)

34. Out of concern for Mr. Bolduc's mental and emotional state, Mr. Lavallee called and spoke with Mr. Bolduc by telephone on Sunday, April 12, 2015.

35. Following the telephone call, Mr. Bolduc sent Mr. Lavallee an email on the morning of April 13th, with a subject line of "Great conversation." The email, in full, states as follows:

> "Good morning,
>
> Thank you for the powerful conversation yesterday, I felt like I was talking to the brother I always loved. No matter how things play out from here, I had to get your attention at any cost to myself so we could have the relationship I've always felt since we first met. You are one of my all time favorite men on many levels that you don't even realize. You and Dawn are a big part of my story that still gives me goose bumps, chapter 2, *The Power of Hon* will explain in greater detail. Chapter TBD, *if nothing changes, nothing changes*, is about this moment, and the fact I'd rather lose my job than feel any other way about you and Dawn [Seiple], and Paul.
>
> Good luck this morning, believe this is a good day in the end. Feel free to use this email in any manner that's helpful to you, even if you need to share it in your meeting. I love you my Brother!!
>
> Enjoy your day!
>
> Marc D. Bolduc."

36. As a result of Mr. Bolduc's unprofessional, insubordinate and erratic behavior, Mr. Lavallee spoke again with Mr. Bolduc on April 16th and informed him of the following:

a. Mr. Bolduc would not be permitted to remain an employee of Laddawn in an ongoing way;

b. Given reassurances by Mr. Bolduc that he would assist with the proper transition of his job duties and responsibilities so as not to place Laddawn's critical information systems

and network at risk, Mr. Bolduc would be permitted to remain an employee for the short-term while a transition plan was finalized; and

c. Laddawn would prepare a separation agreement and independent contractor/consulting agreement for Mr. Bolduc's consideration following the termination of his employment.

37. On April 22, 2015, Mr. Lavallee informed Mr. Bolduc by email that he would be receiving separation paperwork on Friday, April 24th, along with payment of his final wages and any accrued and unused Paid Time Off. In addition, he would receive a separation agreement and a consulting agreement for his review.

38. Mr. Bolduc was provided with a Business Consultant Agreement and a Separation Agreement on April 23, 2015. The Consultant Agreement had a planned effective date of April 27, 2015.

39. At the end of the day on April 23, 2015, Mr. Bolduc sent an email to his manager and Ms. Hanam in which he stated: "The contractor agreement and scope seem pretty good at first glance."

40. On the morning of April 24, 2015, Mr. Bolduc confirmed via email to Ms. Hanam, Mr. Lavallee and Mr. Maloy that he had received his separation package that morning as well.

41. By mid-morning on April 24, 2015, Mr. Maloy had heard from a co-worker of Mr. Bolduc's that Mr. Bolduc had some reservations about the documents he had received. In response, Mr. Maloy emailed Mr. Bolduc as follows: "I spoke to [your co-worker] some and am aware that you have some reservations about signing off on the documents we put together. Do you have some time to discuss? Give me a call or let me know when would be a good time."

42. Mr. Bolduc responded to Mr. Maloy as follows: "Never." One minute after his email response to Mr. Maloy, Mr. Bolduc sent an email to all Laddawn employees, in which he stated: "Good morning everyone, As of 5:00 PM today, I will no longer be an employee of Laddawn. I wish me the best in all my future endeavors. Thanks, Marc."

43. Within 15 minutes, Mr. Lavallee telephoned Mr. Bolduc to clarify whether he intended to transition to the envisioned independent contractor role that had been discussed. Mr. Bolduc did not answer, so Mr. Lavallee left a voicemail. Mr. Bolduc did not return the call.

44. Concerned with Mr. Bolduc's previously demonstrated erratic nature, Mr. Lavallee directed that Mr. Bolduc's remote access to Laddawn's systems be shut down.

45. The following day, having not received a return phone call from Mr. Bolduc, Mr. Lavallee telephoned Mr. Bolduc once again to inform Mr. Bolduc that he had been informed that Laddawn's information systems department could not access critical data backups without the passcodes that Mr. Bolduc had been using. Mr. Bolduc refused to provide the passcodes. Mr. Bolduc then launched into a tirade of insults and personal attacks directed at Mr. Lavallee before hanging up on him.

46. Over the course of the next two weeks, Laddawn attempted to retrieve property that Mr. Bolduc had not returned, and attempted to gain access to its passcodes from Mr. Bolduc. Due to the inflammatory responses often received from Mr. Bolduc, Laddawn sent Mr. Bolduc a letter, dated May 5, 2015, which stated in relevant part: "This letter serves as the final communication in regards to outstanding items referenced in prior E-mails . . . In the interest of all parties who have thus far been involved in this process, we respectfully ask you to cease e-mail communications at this time. We will not be able to respond to any further such communications."

47. As of August, 2015, Mr. Bolduc had come to regret his unprofessional actions. In an email, dated August 15, 2015, to Ladd Lavallee, he stated: "Hey Ladd, I don't have much regret in my lifetime, but I'd hate to leave this great life I've been blessed with by the good Lord above if I didn't tell you that I truly regret the way things ended between you and I. Thanks for the many great years at Laddawn, and all the wonderful memories my friend. I truly hope all's well with you and Dawn, and everyone in your life."

48. Mr. Bolduc sent another email on August 17, 2015 to Mr. Lavallee in which he further stated, in relevant part: ". . . I'll never forget all of the wonderful moments in my life because you were a big part of my life. I think of you quite often, and I do miss you and Dawn a whole bunch. . . . you are a good man Ladd, and I cherished the relationship that we once had. Kind regards, Marc D. Bolduc"

49. On August 28, 2015, Mr. Bolduc emailed Mr. Lavallee once again stating, in relevant part: "I'm very proud of my accomplishments during my time with Laddawn, and grateful for the experience gained while working for such a great organization."

50. In May 2016, shortly after the anniversary of Mr. Bolduc's termination of employment the prior year and in sharp contrast to Mr. Bolduc's profession of wonderful memories and love for Ladd Lavallee, Mr. Bolduc began sending inflammatory and threatening emails once again to Ladd Lavallee and Dawn Seiple, as well as other Laddawn employees. In one of his emails, he accused Mr. Lavallee of having "lied to [him] over and over again" and issued the following threat: "You lied to me constantly Ladd, and ruined 2 years of my life, now it's your turn, you coward." In addition to sending email messages to Mr. Lavallee, Mr. Bolduc was using his Facebook page to refer individuals to a website he created called www.dumplingrock.com, which Mr. Bolduc used as an online forum to harass and disparage Mr. Lavallee and Laddawn.

Mr. Bolduc intentionally chose the name "dumplingrock" based on his knowledge that Ladd Lavallee and Dawn Seiple own a separate business entity known as Dumpling Rock, LLC.

51. Mr. Bolduc's unhealthy obsession with Mr. Lavallee and his threatening behavior took on an added dimension through his creation of a website, "breakingladd.com." The website is intended to disparage and harass Mr. Lavallee, as well as Laddawn.

**D. Issuance of No Contact and No Trespass Letters to Mr. Bolduc**

52. As a result of the disruptive nature of Mr. Bolduc's communications and attempts to communicate through Laddawn's e-mail system, and out of concern for his volatility as demonstrated by his prior threatening behavior, Mr. Bolduc was issued a "Notice of No Contact and No Trespass" on May 23, 2016. As stated therein:

> "As a result of recent aggressive and threatening email messages you sent to [Laddawn] employees, you are being placed on formal notice that you are not to have any future contact with the Company or its employees through the Company's email system or the Company's phone system, including, but not limited to, Ms. Dawn Seiple, Mr. Ladd Lavallee, Ms. Cindy Hanam, Mr. Donald Hafer, and Mr. James Maloy.
>
> You are also formally notified that you are not to trespass on any Company property. You are, therefore, prohibited from trespassing on the Company's property at 155 Jackson Road, Devens, MA, as well as the Company's property at 2 Northeast Blvd., Sterling, MA. To avoid any confusion as to this Notice, you are expressly informed that you may not visit or enter any of the above-referenced properties or any Company-owned buildings at any time.
>
> A copy of this Notice of No Contact and No Trespass is being sent to the Devens and Sterling Police Departments, respectively. Should you continue to contact any Company employees via the Company's email system or the Company's phone system, or be observed on any Company property or in the vicinity of such property, which would raise a concern of your intent to enter the property, the Devens and Sterling Police Departments will be immediately notified."

53. Copies of the Notice of No Contact and No Trespass were delivered to the Devens State Police Department and the Sterling Police Department.

54. On May 24, 2016, Mr. Bolduc contacted Laddawn through "Agent Chat" to inquire about Sterling Plastics.

55. Based on Mr. Bolduc's continued attempt to communicate with Laddawn and/or its employees via Laddawn-owned communication systems, a "Second Notice of No Contact and No Trespass" was sent to Mr. Bolduc on May 16, 2016.

**E. Mr. Bolduc's Cybersquatting**

56. "Laddawn" is a registered trademark with the United States Patent and Trademark Office, Registration No. 2,125,354. The trademark was registered on December 30, 1997.

57. The trademark "Laddawn" is a current and live trademark with the United States Patent and Trademark Office.

58. The trademark "Laddawn" is a formulation of the first names of the co-owners of Laddawn, Inc.: Ladd Lavallee and Dawn Seiple. Mr. Lavallee and Ms. Seiple are siblings.

59. Laddawn, Inc. has (in addition to other trademarks) two additional registered trademarks with the United States Patent and Trademark Office, both bearing the name "Laddawn" with unique shading and contouring of the trademark. Trademark bearing Registration No. 4,208,151 was registered on September 18, 2012; Trademark bearing Registration No. 4,208,154 was registered on September 18, 2012 as well.

60. As a former employee and Network Administrator for Laddawn, Mr. Bolduc was well familiar with the company's website and use of its registered trademarks bearing the name "Laddawn."

61. As a former employee of Laddawn and self-described friend of the two co-owners of Laddawn – Ladd Lavallee and Dawn Seiple – Mr. Bolduc was aware that the company name "Laddawn" was derived by merging the first names of the two co-owners.

62. Without permission or authorization of any kind, Mr. Bolduc has registered the following domain names on the website "GoDaddy.com": Laddawn.co, Laddawn.biz, Laddawn.org, Laddawn.mobi, Laddawn.info, Laddawn.online, Laddawn.us, and Ladd-dawn.com.

63. Mr. Bolduc's actions in registering the eight domain names containing the word "Laddawn" or "Ladd-dawn" occurred between July and November 2015, following termination of his employment.

64. Each of the above-referenced registered domain names is identical or confusingly similar to the distinctive registered trademark "Laddawn."

65. Laddawn's trademark is used in commerce throughout the world and its website, Laddawn.com, is available on the internet worldwide.

66. Mr. Bolduc was never authorized to appropriate for himself the use of the trademark, Laddawn, or any derivation of that distinctive mark.

67. Mr. Bolduc has no legal rights to the registered trademark, Laddawn, nor any other form of intellectual property rights in the distinctive mark.

68. "Laddawn" does not constitute any derivation of Mr. Bolduc's legal name or his nickname.

69. Since registering the eight domain names bearing the name "Laddawn" or "Ladd-dawn", Mr. Bolduc has attempted to sell the domain names to Laddawn.

70. Since registering the eight domain names bearing the name "Laddawn" or "Ladd-dawn", Mr. Bolduc has offered each of the domain names for sale via auction through the website, dumplingrock.com – a website created by Mr. Bolduc.

71. In attempting to sell the domain names, Mr. Bolduc has posted via his Facebook account that the domain names are "available to the highest bidder."

72. As of June 5, 2017, Laddawn.us was being offered for auction on GoDaddy.com at a price of $49,999.00.

73. As of June 5, 2017, Laddawn.co was being offered for sale on GoDaddy.com at a price of $150.00.

74. As of June 5, 2017, Laddawn.biz was being offered for sale on GoDaddy.com with no price set.

75. As of June 5, 2017, Laddawn.online was being offered for auction on GoDaddy.com at a price of $49,999.00.

76. As of June 5, 2017, Laddawn.info was being offered for auction on GoDaddy.com at a price of $50,000.00.

77. As of June 5, 2017, Ladd-dawn.com was being offered for auction on GoDaddy.com at a price of $10,000.00.

78. Mr. Bolduc has a bad-faith intent to profit from the Laddawn trademark.

79. On April 29, 2017, Mr. Bolduc posted on his Facebook account the following: "Fuch [sic] you Ladd, stop defaming my character you AHOLE. FYI, Laddawn.org, Laddawn.biz, Laddawn.info, Laddawn.mobi, Laddawn.us are all available for purchase at auction, as will be www.dumplingrock.com after I win this war against the perennial cowardly bully boy. Take your own advice right from the Laddawn catalog, You did this to yourself Laddie boy, go take a look in the mirror, and GROW A PAIR. LOSER. The truth is going to be a real bitch Karma style. That's not [a] threat, just a promise of peace and love. For me. From me. Punk."

80. Mr. Bolduc acknowledged in writing in a Facebook post, dated May 27, 2016, that the domain dumplingrock.com properly belongs to Ladd Lavallee. Specifically, Mr. Bolduc wrote: "Hey Ladd FUCK YOU Read my story on your domain . . . . . . .. www.dumplingrock.com."

81. Mr. Bolduc has no trademark rights or other intellectual property rights in the eight domain names he registered that contain either "Laddawn" or "Ladd-dawn."

82. Each of domain names registered by Mr. Bolduc contain the legally-registered trademark "Laddawn" or is a derivative of the names commonly used to identify the owners of Laddawn – Ladd and Dawn.

83. Mr. Bolduc, prior to registering the eight domain names, did not use the name "Laddawn" or "Ladd-dawn" in connection with the bona fide offering of any goods or services belonging to him or to a business owned by him.

84. Mr. Bolduc had no reasonable grounds to believe that he was authorized to appropriate use of the trademark "Laddawn" for his own use.

85. Laddawn, via letter dated May 26, 2016, made demand on Mr. Bolduc to transfer ownership of the domain names to Laddawn.

86. In response to the demand letter, Mr. Bolduc refused to transfer ownership of the domain names.

87. In February 2017, Mr. Bolduc expressed a willingness "to negotiate the sale of the domain names" to the Company.

88. Mr. Bolduc's bad faith is further shown in a public Facebook post related to his actions aimed at Laddawn and Ladd Lavallee, dated May 25, 2016, in which Mr. Bolduc wrote: "I'm in the process of torturing the ever living shit out of them for what they did to me."

**F. Defamation of Ladd Lavallee by Mr. Bolduc**

89. In a public Facebook post, dated May 1, 2017, Mr. Bolduc referred to Mr. Lavallee as a "CRIMINAL" (all caps in original).

90. In a later public Facebook post, dated May 1, 2017, Mr. Bolduc wrote that Mr. Lavallee broke "EVERY LEGAL AND HUMANITARIAN LAW POSSIBLE" (all caps in original).

91. In a public Facebook post, dated May 5, 2017, Mr. Bolduc posted photos of Mr. Lavallee and referred to Mr. Lavallee as a "crime-boss."

92. In a public Facebook post, dated May 5, 2017, Mr. Bolduc wrote that Mr. Lavallee uses charities, such as Easter Seals, "to buy away his CRIMES against innocent people" (all caps in original).

93. In a public Facebook post, dated May 5, 2017, Mr. Bolduc accused Mr. Lavallee of "sharing" Mr. Bolduc's HIPAA information "to make himself look good."

94. Mr. Lavallee has no HIPAA information in his possession and, therefore, could not have shared such information.

95. By alleging a violation of HIPAA by Mr. Lavallee, Mr. Bolduc publicly accused Mr. Lavallee of a crime in his May 5, 2017 Facebook post.

96. Mr. Bolduc's intent in making defamatory posts is evident in his text message to a co-worker in which he wrote: "Ladd is going down hard, I promise you. . . . I'm going to ruin him."

97. Mr. Bolduc's defamatory and libelous Facebook postings have caused Mr. Lavallee extreme emotional distress and have damaged his professional reputation.

## COUNT ONE

### (Violation of 15 U.S.C. § 1125(d))

98. Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 97 above.

99. Mr. Bolduc in bad faith registered the following domain names, each of which is identical or confusingly similar to Laddawn's distinctive registered trademark, "Laddawn": Laddawn.co, Laddawn.biz, Laddawn.org, Laddawn.mobi, Laddawn.info, Laddawn.online, Laddawn.us, and Ladd-dawn.com.

100. Mr. Bolduc does not have any trademark rights in the name "Laddawn."

101. Mr. Bolduc does not have any intellectual property rights in the name "Laddawn."

102. Laddawn is a registered trademark with the U.S. Patent and Trademark Office.

103. Mr. Bolduc, as a former employee of Laddawn, understood that the trademark "Laddawn" was used by Laddawn in the sale of goods throughout the world.

104. Mr. Bolduc, as a former employee of Laddawn, and as a self-described former friend of Ladd Lavallee and Dawn Seiple, understood that the name "Laddawn" is a composite of the first names of Laddawn's co-owners who are siblings, Ladd Lavallee and Dawn Seiple.

105. Mr. Bolduc, prior to registering the eight domains, did not use or have authority to use, on his own behalf, the name "Laddawn" for the bona fide offering of any goods or services for sale.

106. After being terminated from employment with Laddawn and after registering the eight domain names referenced above, Mr. Bolduc offered to sell for his own financial gain the domain names to Laddawn.

107. Mr. Bolduc has attempted to sell for his own financial gain each of the eight domain names by placing such names up for sale and/or up for auction on the GoDaddy.com website.

108. Mr. Bolduc has publicly advertised his selling of the domain names referenced above on his Facebook account.

109. Mr. Bolduc has not used any of the eight domain names referenced above for the bona fide offering of any goods or services.

110. Mr. Bolduc's actions as a domain name registrant with respect to the eight domain names referenced above violates 15 U.S.C. § 1125(d).

111. Laddawn is entitled to a permanent injunction against Mr. Bolduc's use of the eight domain names referenced above.

112. Laddawn is entitled to an order of the Court transferring each of the domain names listed above from Mr. Bolduc to Laddawn as the registered trademark holder.

113. Laddawn is entitled to statutory damages for each domain name listed above in an amount to be determined by the Court between $1000.00 and $100,000.00 per domain name, thus, equal to a minimum of $8,000.00 and up to a maximum of $800,000.00 in statutory damages, pursuant to 15 U.S.C. § 1117(d).

**COUNT TWO**

**(Libel)**

114. Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 97 above.

115. Mr. Bolduc has published via his Facebook account in a manner to be viewed by the public repeated allegations that Ladd Lavallee is a "criminal."

116. Mr. Bolduc has published via his Facebook account in a manner to be viewed by the public repeated allegations that Ladd Lavallee has committed crimes.

117. Mr. Bolduc has published via his Facebook account in a manner to be viewed by the public that Mr. Lavallee has violated Mr. Bolduc's rights under HIPAA – allegations that constitute a crime.

118. Mr. Bolduc's libelous statements may prejudice Mr. Lavallee's professional reputation as President of Laddawn, Inc.

119. Mr. Bolduc's libelous statements have caused Mr. Lavallee severe emotional distress

120. Mr. Bolduc's libelous statements have damaged Mr. Lavallee's professional reputation.

121. Mr. Lavallee is entitled to an award of damages for emotional distress and damage to his reputation caused by Mr. Bolduc's libel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Laddawn, Inc. and Ladd Lavallee respectfully request that this Court:

(1) Enter an order requiring that Mr. Bolduc transfer to Laddawn, Inc. each of the eight domain names referenced herein that contain the name "Laddawn" or "Ladd-dawn."

(2) Enter an order permanently enjoining Mr. Bolduc from using, attempting to use, selling, attempting to sell, registering or attempting to register any domain name containing the word "Laddawn", "Ladd-dawn", or any derivative of the word "Laddawn."

(3) Award Laddawn, Inc. statutory damages in the amount of a minimum of $8,000.00 and up to a maximum of $800,000.00, as the Court determines in its discretion, for Mr. Bolduc's violation of 15 U.S.C. 1125(d).

(4) Enter an order permanently enjoining Mr. Bolduc from further engaging in any defamatory or libelous statements or writings concerning Ladd Lavallee.

(5) Award Ladd Lavallee monetary damages in an amount to be determined at trial for emotional distress and damage to his reputation as caused by Mr. Bolduc's libelous statements.

(6) Award Plaintiffs their attorneys' fees and costs.

(7) Award Plaintiffs such other relief as the Court deems just and proper.

**LADDAWN, INC. & LADD LAVALEE,**

By their attorneys,

/s/ Brian M. Casaceli

Robert L. Kilroy, BBO # 636853
Brian M. Casaceli, BBO # 690580
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive
Westborough, MA 01581
Phone: (508) 860-1464
Fax: (508) 983-6264

Dated: June 7, 2017

CERTIFICATE OF SERVICE

I, Brian M. Casaceli, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 7, 2017.

/s/ Brian M. Casaceli

Brian M. Casaceli, Esq.

Dated: June 7, 2017